## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAE HYUNG JUNG, Derivatively on Behalf of ZETA GLOBAL HOLDINGS CORP., <br><br> Plaintiff, <br><br> v. <br><br> DAVID A. STEINBERG, CHRISTOPHER GREINER, JOHN SCULLEY, IMRAN KHAN, WILLIAM ROYAN, JENE ELZIE, WILLIAM LANDMAN, ROBERT NIEHAUS, and JEANINE SILBERBLATT, <br><br> Defendants, <br><br> and, <br><br> ZETA GLOBAL HOLDINGS, CORP., <br><br> Nominal Defendant. | Case No: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Jae Hyung Jung ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Zeta Global Holdings Corp. ("Zeta" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations

of state and federal law that have occurred from February 27, 2024 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.       This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.[1]

3.       This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise

---

[1]       Article XV of the Company's Articles of Incorporation provide that the Company's forum selection clause "will not apply to claims arising under the Securities Exchange Act of 1934, as amended."

purposefully availed themselves of this District through being listed on the Nasdaq in this District, issuing false statements in this District, and maintaining retail stores in this District.

5.      In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6.      *Plaintiff* is, and was at relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7.      *Nominal Defendant Zeta* is a Delaware corporation with its principal executive offices at 3 Park Avenue, 33rd Floor, New York, New York 10016. Zeta's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ZETA."

### Director Defendants

8.      *Defendant David A. Steinberg* ("Steinberg") has served as a Company director since founding the Company in 2007. Defendant Steinberg is also the Company's Chief Executive Officer ("CEO") and controlling shareholder.

9.      *Defendant John Sculley* ("Scully") is a co-founder of Zeta and has served as a Company director since 2008.

10.     *Defendant Imran Khan* ("Khan") has served as a Company director since June 18, 2024. Defendant Khan also serves as a member of the Audit Committee.

11.     ***Defendant William Royan*** ("Royan") has served as a director of the Company since 2017. Defendant Royan also serves as a member of the Audit Committee.

12.     ***Defendant Jene Elzie*** ("Elzie") has served as a director of the Company since 2021. Defendant Elzie also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

13.     ***Defendant William Landman*** ("Landman") has served as a director of the Company since 2008. Defendant Landman also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.

14.     ***Defendant Robert H. Niehaus*** ("Niehaus") has served as a Company director since 2012. Defendant Niehaus also serves as the Chair of the Audit Committee and the Compensation Committee.

15.     ***Defendant Jeanine Barnett Silberblatt*** ("Silberblatt") has served as a Company director since 2022. Defendant Silberblatt also serves as a member of the Nominating and Corporate Governance Committee.

16.     Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, Silberblatt and Khan are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

17.     ***Defendant Christopher Greiner*** ("Greiner") has served as the Company's Chief Financial Officer ("CFO") since 2020.

18.     Defendant Grenier along with Defendant Steinberg are collectively referred to herein as the "Officer Defendants."

19.     The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

20.     Zeta is a marketing technology company. Zeta operates a cloud-based platform for marketers to identify and target potential consumers across a wide range of digital channels. The Company purports to "offer one of the largest proprietary data sets in the U.S." composed of "an amalgamation of [] private proprietary data, publicly available data and data provided by [a] partner ecosystem." As of December 31, 2023, the Company's data set allegedly "contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

21.     On February 27, 2024, Zeta issued a pressed release announcing its financial results for the fiscal year and quarter ended December 31, 2023. The press release touted the Company's "Fourth Consecutive Year of 20%+ Revenue Growth in 2023." Specifically, the press release stated the following, in relevant part:[2]

**Zeta Delivers Fourth Consecutive Year of 20%+ Revenue Growth in 2023**

*Finished 2023 with 10 straight quarters of beating & raising guidance*

- *Delivered revenue of $210M, up 20% Y/Y in 4Q'23, and $729M, up 23% Y/Y in 2023*
- *Increased Scaled Customer count 12% Y/Y and Super-Scaled Customer count 27% Y/Y*
- *Grew Scaled Customer ARPU 10% Y/Y to $1.57M in 2023*
- *Generated cash flow from operating activities of $27M in 4Q'23, and $91M in 2023*
- *Guiding to fifth consecutive year of 20%+ revenue growth*

---

[2]     Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

***

**Full Year 2023 Highlights**

- Total revenue of $729 million, increased 23% Y/Y.
- Scaled Customer ARPU of $1.57 million, increased of 10% Y/Y.
- Super Scaled Customer ARPU of $4.55 million, increased of 1% Y/Y.
- Direct platform revenue mix of 72% of total revenue, compared to 77% in 2022.
- Net Revenue Retention of 111%, compared to 112% in 2022.
- GAAP cost of revenue percentage of 37.7%, increased 120 basis points Y/Y.
- GAAP net loss of $187 million, or 26% of revenue, was driven primarily by
- $243 million of stock-based compensation. The net loss in 2022 was $279 million, or 47% of revenue.
- GAAP loss per share of $1.20, compared to a loss per share of $2.01 in 2022.
- Cash flow from operating activities of $91 million, compared to $78 million in 2022.
- Free Cash Flow1 of $55 million, compared to $39 million in 2022.
- Repurchased $15.4 million worth of shares through our share repurchase program.
- Adjusted EBITDA1 of $129.4 million, an increase of 40% compared to
- $92.2 million in 2022.
- Adjusted EBITDA margin1 of 17.8%, compared to 15.6% in 2022.

22.     On February 28, 2024, the Company submitted its annual report for the fiscal year ended December 31, 2023 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "2023 10-K"). The 2023 10-K was reviewed, approved, and signed by Defendants Steinberg, Grenier, Elzie, Landman, Niehaus, Royan, Sculley, and Silberblatt.

23.     The 2023 10-K described the Company's purported revenue recognition policies and procedures, the purported value of its contract assets, and the purported value of its vendor agreements. Specifically, the 2023 10-K stated, in relevant part, the following:

*Revenues*

***Our revenue primarily arises from use of our technology platform via subscription fees, volume-based utilization fees and fees for professional services***. Our platform revenue comprised of a mix of direct platform revenue and integrated platform revenue, which leverages API integrations with third parties. ***For 2023 and 2022, we derived 72% and 77% of our revenues from direct platform revenue,***

6

*respectively, and 28% and 23% of our revenues from integrated platform revenue, respectively. Revenues are recognized when control of these services is transferred to our customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those services.* Sales and other taxes collected by us are excluded from revenue. Our revenue recognition policies are discussed in more detail under "Critical Accounting Estimates."

***

*Revenue recognition*
*Revenue arises primarily from our technology platform via subscription fees, volume-based utilization fees and fees for professional services* designed to increase our customers' usage of our technology platform. Sales and other taxes collected by us concurrent with revenue-producing activities are excluded from revenues.

***

*We have certain revenue contracts with our vendors that involve both the purchase and sale of services with a single counterparty. We perform an assessment of the services transferred to determine the independent nature of both the transactions and accordingly revenue and expense are based on the fair value of the services provided or received.*

24.      The 2023 10-K further described the Company's sales, product, and data collection policies, touting the that the Company has "the industry's **largest opted-in data set** for omnichannel marketing," allegedly composed of "more than 240 million **opted-in** individuals in the U.S. and more than 535 million **opted-in** individuals globally." Specifically, the 2023 10-K stated the following, in relevant part:

Our Zeta Marketing Platform, or ZMP, is the largest omnichannel marketing platform with identity data at its core. The ZMP can analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and the industry's **largest opted-in data set** for omnichannel marketing. The ZMP acts on these insights by connecting with consumers through native integration of marketing channels and API integration with third parties. The ZMP's data-driven algorithms and processes learn and optimize each customer's marketing program in real time, producing a 'flywheel effect' that enables our customers to test, learn and improve their marketing programs in real time.

***

7

*We have also dedicated significant resources to the goal of building customer trust by developing and implementing programs designed to protect data privacy and to promote a secure technical environment.* The resources we dedicated to this goal include engineers, analysts, lawyers, policy experts and operations specialists, as well as hardware and software from leading vendors and solutions we have designed and built. In particular, we have implemented a number of technical innovations, process enhancements and industry solutions in response to our increased obligations with respect to our data. *For example, we can identify and implement user consent parameters and opt-in or opt-out as applicable and can evaluate whether such consents apply to our various data sources, products or customers*.

The ZMP is built on the following four pillars:

1. *Opted-in Data Set*

Our data set is an amalgamation of our private proprietary data, publicly available data and data provided by our partner ecosystem.

*Our data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally* with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference. On average, we ingest more than one trillion content consumption signals per month on a global basis and synthesize this information into hundreds of intent-based audiences, which can then be used to create marketing programs. All this data is managed through a proprietary database structure that has patented flexibility, speed and scalability.

\*\*\*

*The principal way that we collect individual opted-in data is directly from the consumers when they register or interact with our platform (such as the DISQUS commenting system), or with partners' services.* We also use various tracking technologies, both proprietary and those provided through third-party suppliers in order to connect to individuals across marketing channels for the purpose of targeting consumers and delivering campaigns.

25.    On April 26, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

26.    The 2024 Proxy Statement called for the Company's shareholders to vote to, inter alia: (1) re-elect Defendants Steinberg and Sculley to the Board; (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on an advisory basis, the compensation of the Company's named executive officers. The 2024 Proxy Statement contained the following information, in relevant part:

Our Amended and Restated Bylaws and Corporate Governance Guidelines provide our Board with flexibility to combine or separate the positions of Chairperson of the Board and Chief Executive Officer in accordance with its determination that utilizing one or the other structure would be in the best interests of our Company. The Company's current Board leadership structure comprises a combined Chairperson of the Board and Chief Executive Officer as well as highly qualified, active independent directors. Our Board exercises its judgment in combining or separating the roles of Chairperson of the Board and Chief Executive Officer as it deems appropriate in light of prevailing circumstances. The Board will continue to exercise its judgment on an ongoing basis to determine the optimal Board leadership structure that the Board believes will provide effective leadership, oversight and direction, while optimizing the functioning of both the Board and management and facilitating effective communication between the two. The Board has concluded that the current structure provides a well-functioning and effective balance between strong Company leadership and appropriate safeguards and oversight by independent directors.

Risk assessment and oversight are an integral part of our governance and management processes. Our Board encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.

\* \* \*

We have a written Code of Ethics and Conduct that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and agents and representatives. We have posted a current copy of the

Code of and Ethics and Conduct on our website, www.investors.zetaglobal.com, in the "Governance" section under "Governance Documents." The nominating and corporate governance committee of our Board is responsible for overseeing our code of ethics and conduct and any waivers applicable to any director, executive officer or employee. We intend to disclose any future amendments to certain provisions of our code of ethics and conduct, or waivers of such provisions applicable to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and agents and representatives, on our website identified above or in public filings within four business days. In addition, we intend to post on our website all disclosures that are required by law or the rules of the NYSE concerning any amendments to, or waivers from, any provision of the Code of Ethics and Conduct.

27.    Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt, caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Company collected most of its customer data from a network of sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses (*i.e.*, the "Data Collection Misconduct"); (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

28.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions. As the Director Defendants knew, or should have known in the exercise of prudent

business judgment, the foregoing, these statements are half-truths, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

29.     As a result of Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, and Silberblatt causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Steinberg and Sculley to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve named executive officer compensation on an advisory, non-binding basis.

30.     On May 6, 2024, Zeta issued a press release announcing its financial results for the quarter ended March 31, 2024. The press release touted the Company's "Accelerating Growth" including "revenue of $195M, an increase of 24% Y/Y." Specifically the press release stated the following, in relevant part:

**Zeta Beats 1Q'24 and Guides to Accelerating Growth in 2024**

- *Delivered Delivered revenue of $195M, an increase of 24% Y/Y*
- *Grew total Scaled Customer count to 460, an increase of 8 Q/Q, and Super Scaled Customer count to 144, an increase of 13 Q/Q*
- *Expanded quarterly Scaled Customer ARPU 11% Y/Y to $416K*
- *Generated cash flow from operating activities of $25M, an increase of 23% Y/Y, and Free Cash Flow of $15M, an increase of 51% Y/Y*
- *Raising guidance for each quarter of 2024 with the full year revenue growth rate expected to accelerate*

\*\*\*

**First Quarter 2024 Highlights**

- Total revenue of $195 million, increased 24% Y/Y.

- Scaled Customer count increased to 460 from 452 in 4Q'23 and 411 in 1Q'23.

- Super-Scaled Customer count increased to 144 from 131 in 4Q'23 and 110 in 1Q'23.

- Quarterly Scaled Customer ARPU of $416,000, increased 11% Y/Y.

- Quarterly Super-Scaled Customer ARPU of $1.12 million, decreased 3% Y/Y.

- Direct platform revenue mix of 67% of total revenue, compared to 73% in 4Q'23, and compared to 71% in 1Q'23.

- GAAP cost of revenue percentage of 39.4%, decreased 80 basis points Q/Q, and increased 490 basis points Y/Y.

- GAAP net loss of $40 million, or 20% of revenue, driven primarily by $53 million of stock-based compensation. The net loss in 1Q'23 was $57 million, or 36% of revenue.

- GAAP loss per share of $0.23, compared to a loss per share of $0.38 in 1Q'23.

- Cash flow from operating activities of $25 million, compared to $20 million in 1Q'23.

- Free Cash Flow of $15 million, compared to $10 million in 1Q'23.

- Repurchased $3.5 million worth of shares through our share repurchase program.

- Adjusted EBITDA of $30.5 million, increased 27% Y/Y compared to $24.0 million in 1Q'23.

- Adjusted EBITDA margin of 15.6%, compared to 15.3% in 1Q'23.

31.     On May 7, 2024, the Company submitted its quarterly report for the period ended March 31, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report described the Company's purported revenue recognition policies, the purported value of its contract assets, and the purported valued of its vendor agreements. Specifically, the quarterly report stated, in relevant part:

**Revenue Recognition**

***Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology.***

***Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to an exchange for those services.*** Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

*** ***

**Contract assets and liabilities**

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. ***Total contract assets were $7,770 and $5,346 as of March 31, 2024 and December 31, 2023***, respectively, and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets.

Contract liabilities consists of deferred revenue that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenue is subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies. During the three months ended March 31, 2024 and 2023, the Company billed and collected $3,382 and $3,096 in advance, respectively, and recognized $2,228 and $1,616, respectively, as revenues. As of March 31, 2024 and December 31, 2023, the deferred revenue were $4,455 and $3,301, respectively.

32.     On July 31, 2024, Zeta issued a press release announcing its financial results for the quarter ended June 30, 2024. The press release touted the Company's "Accelerate[d] Revenue Growth" including "record quarterly revenue of $228M, up 33% Y/Y." Specifically the press release stated the following, in relevant part:

**Zeta Accelerates Revenue Growth and**
Achieves the "Rule of 50" in 2Q'24

- *Delivered record quarterly revenue of $228M, up 33% Y/Y and $16M better than guidance*

- *Grew total Scaled Customer count to 468, and increase of 8 Q/Q and 43 Y/Y*

- *Increased quarterly Scaled Customer ARPU to $479K, up 22% Y/Y, 2x faster than 1Q'24*

- *Generated cash flow from operating activities of $31M, an increase of 51% Y/Y, and Free Cash Flow of $20M, an increase of 53% Y/Y*

- *Raising 2024 revenue guidance by $25M to a midpoint of $925M or 27% Y/Y growth*

***

**Second Quarter 2024 Highlights**

- Total revenue of $228 million, increased 33% Y/Y.

- Scaled Customer count of 144 compared to 144 in 1Q'24 and 118 in 2Q'23.

- Quarterly Scaled Customer ARPU of $479,000, increased 22% Y/Y.

- Quarterly Super-Scaled Customer ARPU of $1.3 million, increased 18% Y/Y.

- Direct platform revenue mix of 67% of total revenue, compared to 67% in 1Q'24, and 75% in 2Q'23.

- GAAP cost of revenue percentage of 40%, increased 50 basis points Q/Q, and increased 390 basis points Y/Y.

- GAAP net loss of $28 million, or 12% of revenue, driven primarily by $52 million of stock-based compensation. The net loss in 2Q'23 was $52 million, or 30% of revenue.

- GAAP loss per share of $0.16, compared to a loss per share of $0.34 in 2Q'23.

- Cash flow from operating activities of $31 million, compared to $21 million in 2Q'23.

- Free Cash Flow 1 of $20 million, compared to $13 million in 2Q'23.

- Repurchased $2.9 million worth of shares through our share repurchase program.

- Adjusted EBIDTA 1 of 38.5 million, increased 44% Y/Y compared to $26.8 million in 2Q'23.

- Adjusted EBIDTA margin 1 of 16.9%, compared to 15.6% in 2Q'23.

33.     On August 1, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report described the Company's purported revenue recognition policies, the purported value of its contract assets, and the purported valued of its vendor agreements. Specifically, the quarterly report stated, in relevant part:

**Revenue Recognition**

***Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology.***

***Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to an exchange for those services.*** Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

***When the Company enters into contracts with third parties in which the Company is acting as both a vendor and a customer, the Company performs an assessment of the services transferred to determine the independent nature of both the transactions. The Company presents the revenue and expense based on the fair value of the services provided or received.***

*Contract assets and liabilities*

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. ***Total contract assets were $7,985 and $5,346 as of June 30, 2024 and December 31, 2023, respectively,*** and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets.

Contract liabilities consists of deferred revenues that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenues are subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies. ***During the six months ended June 30, 2024 and 2023, the Company billed and collected $7,878 and $4,249 in advance, respectively, and recognized $7,496 and $3,096, respectively, as revenues. As of June 30, 2024 and December 31, 2023, the deferred revenues were $3,683 and $3,301, respectivel***y.

34.     On November 11, 2024, Zeta issued a press release announcing its financial results for the quarter ended September 30, 2024. The press release touted the Company's "accelerate[d]

Revenue Growth to 42%" and "record revenue of $268M, an increase of 42% Y/Y." Specifically

the press release stated the following, in relevant part:

### Zeta Accelerates Revenue Growth to 42% and

Achieves the "Rule of 60" in 3Q'24

- *Delivered record revenue of $268M, an increase of 42% Y/Y*

- *Grew Direct revenue 41% Y/Y and increased Direct revenue mix by 300 bps Q/Q to 70%*

- *Increased Scaled Customer ARPU to $557K, a record increase of 33% Y/Y*

- *Generated cash flow from operating activities of $34M, an increase of 51% Y/Y, and Free Cash Flow of $26M, an increase of 93% Y/Y*

- *Raising 4Q24 revenue growth guidance of 40% Y/Y*

\*\*\*

**Third Quarter 2024 Highlights**

- Total revenue of $268.3 million, increased 42% Y/Y, up 31% Y/Y excluding political candidate revenue.

- Scaled Customer count increased to 475 from 468 in 2Q'24 and 440 in 3Q'23.

- Super-Scaled Customer count of 144 compared to 144 in 2Q'24 and 124 in 3Q'23.

- Quarterly Scaled Customer ARPU of $557,231, increased 33% Y/Y.

- Quarterly Super-Scaled Customer ARPU of $1.6 million, increased 30% Y/Y.

- Direct platform revenue grew 41% Y/Y at a mix of 70% of total revenue, compared to 67% in 2Q'24, and 70% in 3Q'23.

- GAAP cost of revenue percentage of 39%, decreased 60 basis points Q/Q, and increased 50 basis points Y/Y.

- GAAP net loss of $17.4 million, or 6% of revenue, driven primarily by $47.2 million of stock-based compensation. The net loss in 3Q'23 was $43.1 million, or 23% of revenue.

- GAAP loss per share of $0.09, compared to a loss per share of $0.27 in 3Q'23.

- Cash flow from operating activities of $34.4 million, compared to $22.8 million in 3Q'23.

- Free Cash Flow 1 of $25.7 million, compared to $13.4 million in 3Q'23.

- Repurchased $3.9 million worth of shares through our share repurchase program.

- Adjusted EBITDA 1 of $53.6 million, increased 59% Y/Y compared to $33.7 million in 3Q'23.

- Adjusted EBITDA margin 1 of 20.0%, compared to 17.9% in 3Q'23

35.    On November 12, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report described the Company's purported revenue recognition policies, the purported value of its contract assets, and the purported valued of its vendor agreements. The quarterly report further described the Company's acquisition related liabilities including "projections for businesses acquired in its Apptness, [ ] and ArcaMax acquisitions." Specifically, the quarterly report stated, in relevant part:

**Revenue Recognition**

*Revenue arises primarily from the Company's technology platform via subscription fees, volume-based utilization fees and fees for professional services designed to maximize the customer usage of technology.*

*Revenues are recognized when control of these services is transferred to the customers, in an amount that reflects the consideration we expect to be entitled to in exchange for those service*s. Sales and other taxes collected by the Company concurrent with revenue-producing activities are excluded from revenues.

*When the Company enters into contracts with third parties in which the Company is acting as both a vendor and a customer, the Company performs an assessment of the services transferred to determine the independent nature of both the transactions. The Company presents the revenue and expense based on the fair value of the services provided or received.*

*Contract assets and liabilities*

Contract assets represent revenue recognized for contracts that have not been invoiced to customers. ***Total contract assets were $11,998 and $5,346 as of September 30, 2024 and December 31, 2023, respectively***, and are included in the account receivables, net, in the condensed unaudited consolidated balance sheets. Contract liabilities consists of deferred revenues that represent amounts billed to the customers in excess of the revenue recognized. Deferred revenues are subsequently recorded as revenues when earned in accordance with the Company's revenue recognition policies. ***During the nine months ended September 30, 2024 and 2023, the Company billed and collected $19,104 and $4,724, respectively, in advance, and recognized $18,819 and $4,620, respectively, as revenues. As of September 30, 2024 and December 31, 2023, the deferred revenues were $3,586 and $3,301, respectively.***

36.     The above-referenced statements were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors: (i) that Zeta used two-way contracts to artificially inflate financial results; (ii) that Zeta engaged in round trip transactions to artificially inflate financial results; (iii) that Zeta utilized predatory consent farms to collect user data; (iv) that these consent farms have driven almost the entirety of Zeta's growth; and (5) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

37.     On November 13, 2024, at approximately 1:00 p.m. eastern standard time, market research group Culper Research published a report entitled "Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam." (the "Culper Report"). The Culper Report alleged that the "integrity of the Company's data collection and reported financials" is severely undermined by two factors:

   a. ***First***, the Culper Report alleged that "Zeta has formed 'two-way' contracts with third party consent farms wherein the Company simultaneously acts as both a

supplier and a buyer of consumer data" allowing the Company to "flatter reported revenue growth" and indicating possible "roundtripping" of revenue.

b. ***Second***, the Culper Report alleged that Zeta's collects the majority of its customer data from a network of "sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses." For example, the Culper Report alleged the Company and its subsidiaries operate a number of fake job boards which are designed to trick individuals into submitting personal data under the pretense of job applications. The Culper Report further alleged that the Company's "most valuable data" comes from these predatory websites, dubbed consent farms, which are "responsible for almost the entirety of the Company's growth."

38.     Specifically, the Culper Report stated, as follows, in relevant part:

### Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam

We are short Zeta Global Holdings Corp ("ZETA", "the Company") for two distinct, but related reasons, each of which we believe undermine the integrity of the Company's data collection and reported financials. ***First, we believe Zeta has formed "two-way" contracts with third party consent farms wherein the Company simultaneously acts as both a supplier and a buyer of consumer data, not only allowing the Company to flatter reported revenue growth, but raising round tripping concerns. Second, we believe that Zeta has quietly spun up its own network of consent farms i.e., sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses, baited by job applications, stimulus money, or other rewards that simply do not exist.*** We believe that these consent farms have driven almost the entirety of Zeta's growth over the past 2+ years and now represent 56% of reported Adj. EBITDA.

***

***Our report presents substantial evidence to suggest that Zeta holds additional "two-way" contracts with its advertising partners, many of which are other consent farms.*** For example, Zeta-run websites disclose that the Company sells customer data to Digital Media Solutions ("DMS"), which went bankrupt in September 2024. We uncovered an October 2024 bankruptcy filing in which DMS

names "Zeta: Apptness" as a "major customer", suggesting that **the two groups are selling data back and forth, i.e., de facto round-tripping.** Zeta has not disclosed the extent of these "two-way" contracts – after all, the Company has kept quiet about its massive consent farm operation in the first place – but we counted at least 20 consent farming websites that Zeta lists among its partners.

We uncovered at least 40 websites run by Apptness and Arcamax – with names such as higherincomejobs.com, onlygreatjobs.com, stimmoney.com, and unclaimedmoneyinfo.com – that **bait visitors into disclosing data to Zeta under the promise of job applications, stimulus checks, or other rewards that don't actually exist.** These are massive operations: SimilarWeb data reveals that these sites have received an astounding 158.7 million visits from 85.9 million unique visitors in the past year alone.

***

We believe these consent farms have become critical to Zeta's business. One former employee told us that on a combined basis, Apptness and Arcamax were internally expected to generate $300 million in revenues after 2 years under Zeta's control.

***

[*U*]*sing a reverse website lookup service, we found that Apptness Media owns at least 3 websites, each of which appear to be job board websites*, including higherincomejobs.com and higherincomejobs.net. In December 2023, Apptness filed a Florida fictitious name registration for "Higher Income Jobs", corroborating its ownership:



At first glance, higherincomejobs.com appears to be a run-of-the-mill job board However, the vast majority of website visitors do not land directly on the higherincomejobs.com home page, as one might expect from someone using the website like they do LinkedIn. Instead, SimilarWeb data shows that 98% of inbound website visitors land on subdomains such as "amazon03.higherincomejobs.com", "fedex05.higherincomejobs.com" or "goodwill01.higherincomejobs.com" as illustrated below:



*Once visitors land on one of these pages, they are baited into submitting their personal information, as the sites blatantly rip off logos from would-be employers such as FedEx, despite having no affiliation with the employer.*

We visited numerous higherincomejobs.com listings, and rather than being met with genuine job applications, *every single link we followed led us instead to "dummy" pages designed to reap our personal information*

\*\*\*

*We cross-referenced common addresses, phone numbers, and corporate records to find at least 40 websites that appear to be run by Apptness*

\*\*\*

[For example] unclaimedmoneyinfo.com [which] dangles the prospect of "unclaimed money" to its visitors, only to collect users' data, much like we saw of the sham job listings offered by higherincomejobs.com.



*SimilarWeb data further estimates that in total, over the last twelve months (ended October 2024) these websites collectively received an astounding 158.7 million from 85.9 million unique visitors.*

| # | Website | Date Registered | Last Updated | LTM Visits (Ms) | LTM Unique Visitors (Ms) |
|---|---------|-----------------|--------------|-----------------|--------------------------|
| 1 | higherincomejobs.com | Sep-16 | Sep-24 | 62.2 | 36.2 |
| 2 | onlygreatjobs.com | Dec-17 | Nov-23 | 43.0 | 20.1 |
| 3 | stimmoney.com | Mar-20 | Feb-24 | 14.7 | 7.4 |
| 4 | freshcareerfinder.com | Aug-16 | Jul-24 | 12.7 | 6.1 |
| 5 | unclaimedmoneyinfo.com | Jul-20 | Jun-24 | 9.8 | 5.6 |
| 6 | apptrck.com | Mar-20 | Feb-24 | 8.7 | 5.7 |
| 7 | eligibilitylookup.com | Sep-20 | Aug-24 | 2.0 | 1.3 |
| 8 | arcamaxjobs.com | Apr-22 | Apr-23 | 1.6 | 1.2 |
| 11 | jobzoodle.com | Nov-21 | Oct-24 | 1.2 | 0.8 |
| 9 | topjobofferstoday.com | May-23 | Apr-24 | 0.9 | 0.4 |
| 10 | signupconfirmed.com | Jun-22 | May-24 | 0.8 | 0.6 |
| 14 | bingearcamax.com | Sep-22 | Jul-24 | 0.5 | 0.3 |
| 13 | localcareerz.com | Dec-20 | Nov-23 | 0.3 | 0.2 |
| 12 | mybestjobmatch.com | May-23 | Apr-24 | 0.3 | 0.2 |
| 15 | americanjobfinder.com | Dec-20 | Nov-23 | n/a | n/a |
| 16 | yourmorningtea.com | Feb-21 | Dec-23 | n/a | n/a |
| 17 | americanresourcehub.com | Feb-21 | Jan-24 | n/a | n/a |
| 18 | welcomeconfirmation.com | Jun-22 | May-24 | n/a | n/a |
| 19 | betterincomesearch.com | Sep-22 | Aug-24 | n/a | n/a |
| 20 | hijnow.com | Feb-23 | Jan-24 | n/a | n/a |
| 21 | getmorehigherincomejobs.com | Feb-23 | Jan-24 | n/a | n/a |
| 22 | higherincomeplans.com | Mar-23 | Feb-24 | n/a | n/a |
| 23 | higherincomejobsworld.com | Mar-23 | Feb-24 | n/a | n/a |
| 24 | finesthigherincomejobsonline.com | Mar-23 | Feb-24 | n/a | n/a |
| 25 | preferablehigherincomejobs.com | Mar-23 | Feb-24 | n/a | n/a |
| 26 | getworkfromhomejobs.com | May-23 | Apr-24 | n/a | n/a |
| 27 | searchjobsdirect.com | May-23 | Apr-24 | n/a | n/a |
| 28 | topdollarcareers.com | May-23 | Apr-24 | n/a | n/a |
| 29 | higherjobupdates.com | Jul-23 | Jun-24 | n/a | n/a |
| 30 | moreincomejobs.com | Jul-23 | Jul-24 | n/a | n/a |
| 31 | earnhigherincomes.com | Jul-23 | Jul-24 | n/a | n/a |
| 32 | gohigherincomejobsprime.com | Oct-23 | Nov-24 | n/a | n/a |
| 33 | higherincomejobscareers.com | Oct-23 | Nov-24 | n/a | n/a |
| 34 | gethigherincomejobonline.com | Mar-24 | Mar-24 | n/a | n/a |
| 35 | highincomecareeroptions.com | Apr-24 | Apr-24 | n/a | n/a |
| 36 | eliteearningopportunities.com | Apr-24 | Apr-24 | n/a | n/a |
| 37 | tophigherincomejobsforu.com | May-24 | May-24 | n/a | n/a |
| 38 | higherincomejobsupdate.com | May-24 | May-24 | n/a | n/a |
| 39 | higherincomejobsresult.com | May-24 | May-24 | n/a | n/a |
| 40 | registerednursingcareers.com | Jun-24 | Jun-24 | n/a | n/a |
| | **TOTAL** | | | 158.7 | 85.9 |

\* bolded domains auto-redirect to higherincomejobs.com or other ZETA websites

n/a listed are redirects and/or insignificant web traffic less than 100,000 visits in the LTM

**We Estimate Zeta's Consent Farms Have Driven Almost the Entirety of Revenue Growth Since Being Acquired, Now Represent 56% of EBITDA.**

We believe that Zeta's consent farming network, spearheaded by Apptness and Arcamax and bolstered by share gains in the wake of the FTC's charges against Fluent, have driven almost the entirety of Zeta's revenue growth since being acquired, and now represent 56% of LTM Adjusted EBITDA. A summary of our estimates are shown in the table, with our full commentary below.

| Culper Est. ZETA Consent Farm Business | $ millions |
|---|---|
| Est. Revenues: Apptness | $230 |
| Est. Revenues: Arcamax | $110 |
| Est. Revenues: Fluent share gain | $63 |
| **Est. Total: Consent Farm Revenues** | **$403** |
| Est. EBITDA Margin Contribution | 23% |
| **Est. Consent Farm EBITDA** | **$94** |
| Reported Revenues, LTM ended Q3 2024 | $901 |
| Reported Revenues, LTM ended Q4 2021 | $458 |
| Revenue Growth: Q4 2021 to Q3 2024 | $443 |
| Reported Adj. EBITDA, LTM ended Q3 2024 | $167 |
| **Consent Farms as % of Revenue Growth** | **91%** |
| **Consent Farms as % of Adj. EBITDA** | **56%** |

**Zeta's "Two-Way" Relationships with Third Party Consent Farms Raise Revenue Round-Tripping Concerns, In Our View**

We are not only concerned by the problematic ways in which Zeta appears to collect customer data and its significant impact on the business, but by the Company's "two-way" relationships with third-party consent farms, which we believe raises revenue round-tripping concerns.

**Kubient: Sources Suggest Zeta is Customer-1 in DOJ Round-Tripping Fraud Complaint**

In September 2024, former Kubient (OTC:KBNT) CEO Paul Roberts pled guilty to accounting fraud charges in connection with Kubient's scheme to "improperly recognize more than $1.3 million in fraudulent revenue" representing "over 94% of Kubient's reported revenue" ahead of its 2020 IPO. According to the complaint, in October 2019, Kubient formed an agreement with an unnamed "Company-1" to round-trip revenues between the two companies, without either company ever actually providing services to the other.

\*\*\*

Zeta disclosed in its Q2 2023 Form 10-Q that:

*"We and members of our senior executive team have received subpoenas from the Securities and Exchange Commission in connection with an investigation into Kubient, Inc., a company we worked with prior to our initial public offering, and*

*from the United States Attorney's Office for the Southern District of New York, which is conducting a parallel investigation. The amount of business that we conducted with Kubient was quantitively insignificant to Zeta and we have not worked with Kubient since 2020. We are cooperating with the investigation."*

Based on this disclosure as well as conversations with those familiar, **we find it highly probable that Zeta is the unnamed "Company-1" mutual beneficiary referenced in the DOJ complaint**. We also note that the now-charged Roberts and Steven Gerber, Current President and COO at Zeta, previously worked together at Tranzact Media, which was also co-founded by Zeta's former President Michael Dimaio.

\*\*\*

**Zeta's Own Disclosures Confirm: The Company Has Two-Way Deals With Many Other Consent Farms, Many of Which Have Incestuous Relationships with Zeta**

Zeta holds itself out to investors as servicing large enterprises, yet our review of the Company's customers – as disclosed by the Company itself – reveals that Zeta also sells leads to third party consent farms, many of whom also appear to serve as suppliers to Zeta. See for example that Higher Income Jobs discloses its list of third party advertising partners, while this same list can be found on other Apptness-run websites. As shown, many of Zeta's "third party advertising partners" are themselves consent farms[.]

\*\*\*

**In 2023, Zeta's Auditor Identified a Critical Audit Matter Related to Revenue Recognition on these Two-Way Contracts. Further Language Suggests They are Numerous**

In Zeta's 2023 Form 10-K, the Company disclosed for the first time a critical audit matter related to revenue recognition "on contracts with third parties in which the Company is acting as both a vendor and a customer.

\*\*\*

Zeta's auditor E&Y then states that the group addressed the critical audit matter by "selecting a sample of contracts for detailed testing wherein the Company is acting as both a vendor and customer..." and "making inquiries of management regarding the nature of the arrangement" among other checks. Setting this aside, **the very fact that Zeta has enough contracts of this nature such that auditors can only evaluate a sample of these contracts corroborates our view that contracts of this nature are widespread.**

*In total, we found at least 20 other consent farming websites that Zeta lists as among its "third party advertising partners*."

\*\*\*

**Zeta CEO Previously Ran InPhonic, Which Was Charged by the FTC for Misleading Customers, and Formers Were Later Charged with "Round-Tripping" Transactions to Inflate Financials**

We find Zeta's predatory consent farms and two-way contracts particularly interesting in light of two sets of fraud charges levied against Zeta CEO David Steinberg's prior company, InPhonic Inc.

Zeta's long-time CEO and, per his Instagram, full-time socialite David Steinberg co-founded InPhonic Inc alongside Zeta Chairman John Sculley in the dot-com era. InPhonic sold wireless devices and services online until it went bankrupt in 2007. In April 2007, the FTC charged InPhonic, alleging that the company used rebates to bait its consumers into making purchases, then "among other things, failed to provide promised documents needed to obtain rebates, to send out rebate checks in the time promised, and to disclose adequately certain material terms and conditions prior to purchase."

39.    On this news, the Company's stock price fell $10.46, or 37.07%, to close at $17.76

per share on November 13, 2024, on unusually heavy trading volume.

40.    On November 13, 2024, after the market closed, Zeta issued a press release denying

the allegations of the Culper report based on a "preliminary review and evaluation of the report."

Specifically, the Company stated, in relevant part:

Zeta is confident in its data collection practices, policies and processes to ensure compliance with applicable laws. We do not operate so-called "consent farms". Zeta has made significant investments in its data protection, data governance, and privacy oversight and is regularly audited and reviewed by partners and clients. In addition, Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners.

Contrary to the report, the total contribution of Apptness and ArcaMax to Zeta's business is not material. Together, through the third quarter of 2024, their year-to-date revenue contribution is less than 3% and they make up less than 1% of Zeta's data assets. These contributions have trended down. As further evidence of the inaccuracies of the report, Digital Media Solutions is not a material customer or partner, as demonstrated by its trailing twelve-month revenue being less than $200,000 as of September 30, 2024.

## DAMAGE TO THE COMPANY

**Securities Class Action**

41.     On November 22, 2024, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Davoodi v. Zeta Global Holdings Corp., et al.*, Case No. 1:24-cv-08961 (S.D.N.Y.) (the "Securities Class Action").

42.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers.  The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

43.     At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

44.     Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

45.     However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

46.     In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

47.     The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

48.     The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

49.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

50.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless

disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**<u>Code of Conduct</u>**

51.     At all relevant times, the Company had in place its Code of Ethics and Conduct ("Code of Conduct") which applies to "[a]ll directors, officers and employees" and is "to encourage:"

• Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

• Full, fair, accurate, timely and understandable disclosure;

• Compliance with applicable governmental laws, rules and regulations;

• Prompt internal reporting of any violations of law or the Code;

• Accountability for adherence to the Code, including fair process by which to determine violations;

• Consistent enforcement of the Code, including clear and objective standards for compliance;

• Protection for persons reporting any such questionable behavior;

• The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

• Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

52.     In a section entitled "Disclosures," the Company's Code of Conduct states:

The information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or

omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

53.     In a section entitled "Compliance with Laws, Rules and Regulations," the Code of

Conduct states the following, in relevant part:

> The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

> The Chief Executive Officer, Chief Financial Officer, SVP, Finance, and SVP, Global Controller (or persons performing similar functions) of the Company (together, the "Senior Financial Officers") are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

> Covered Parties located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act ("FCPA") and U.S. export control laws, in addition to applicable local laws.

54.     With respect to "Reporting, Accountability and Enforcement," the Code of Conduct

states the following:

> The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including the officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation. Covered Parties can also anonymously report ethical concerns or wrongdoing, by using the following link: [*hyperlink*].

> Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof.  Reports may be made anonymously.   If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

> The Audit Committee of the Board or other appropriate officer or body shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports.   The Audit Committee or other appropriate officer or body will then determine the appropriate disciplinary action.

Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

55.    In a section entitled "Accuracy of Business Records," the Code of Conduct also states:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

56.    Finally, the Code of Conduct outlines the "Consequences of Violating the Code," as follows:

If you are an employee, officer or director, this Code forms part of the terms and conditions of your employment at the Company. Employees, officers, and directors are expected to cooperate in internal investigations of allegations of violations of the Code and actual violations may subject you to the full range of disciplinary action including, with respect to employees and officers, discharge from the Company. Violations of this Code may also constitute violations of law and may result in civil or criminal penalties.

## Audit Committee Charter

57.    At all relevant times, the Company had in place its Audit Committee Charter which set forth the additional duties and responsibilities of the Audit Committee members, which consists of Defendants Niehaus, Royan, and Khan. The Audit Committee Charter states that the Audit Committee's purpose is to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor."

58.     The Audit Committee Charter sets forth the following specific duties and responsibilities of each member of the Audit Committee:

_Interaction with the Independent Auditor_

1. *Appointment and Oversight*.  The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

2. *Annual Report on Independence and Quality Control*.  The Committee must, at least annually, obtain and review a report from the independent auditor describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

_Annual Financial Statements and Annual Audit_

3. *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. *Form 10-K Review*.  The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. *Audit Committee Report*.  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

_Quarterly Financial Statements_

6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7. *Review of Earnings Releases*.  The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. *Risk Assessment and Risk Management*.  The Committee must discuss the Company's policies with respect to risk assessment and risk management.

9. *Hiring of Independent Auditor Employees*.  The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

10. *Complaint Procedures*.  The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

11. *Reports to the Board of Directors*.  The Committee must report regularly to the Board regarding the activities of the Committee.

12. *Committee Self-Evaluation*.  The Committee must at least annually perform an evaluation of the performance of the Committee.

13. *Review of this Charter*.  The Committee must annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

## DUTIES OF THE DIRECTOR DEFENDANTS

59.     As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

60.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors

that the Director Defendants were aware posed a risk of serious injury to the Company.

61.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

62.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

63.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid

wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

64.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were

aware, or should have been aware, posed a risk of serious injury to the Company.

65. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

67. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

68. Plaintiff is a current owner of the Company's stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

69. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

70. The Company Board is currently comprised of eight (8) members – including Defendants Steinberg, Sculley, Niehaus, Elzie, Royan, Landman, Silberblatt, and Khan. Thus,

Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

71.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

72.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

73.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

74.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and

prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

75.     As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

76.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

77.     Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

78.     Each of the Director Defendants solicited the proxy statements containing the false and misleading statements, as discussed *supra*, which obtained their re-election to the Board, thus enabling them to continue breaching their fiduciary duties to the Company. As each Director Defendant benefitted, either directly or indirectly, from the false and misleading proxy statements, they are incapable of considering a demand to sue.

79.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

80.     Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for Zeta for any of the misconduct alleged herein.

81.     In addition, Defendant Steinberg owns 61.2% of the Company's total voting power. As such, the Company is a "controlled company" under NYSE listing standards. Being such, the Director Defendants cannot reasonably consider a demand to sue Defendant Steinberg given his influence and control over the Company and its Board.

**THE DIRECTOR DEFENDANTS ARE
NOT INDEPENDENT OR DISINTERESTED**

**Defendant Steinberg**

82.     Defendant Steinberg is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Steinberg cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

83.     As CEO, Defendant Steinberg also fails the NYSE bright-line independence test as set forth in NYSE Listed Company Manual, § 303A.02(b) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Steinberg could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Steinberg is therefore futile.

84.     Furthermore, as a co-founder of the Company, Defendant Steinberg is inherently conflicted and cannot reasonably consider a demand to sue the officers and directors who help run his Company and who are responsible for the future success of the Company. In addition,

38

Defendant Steinberg is not independent from Defendant Sculley as they are each indebted to one another having built the Company together.

85.    Defendant Steinberg also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Steinberg is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

86.    In addition, Defendant Steinberg receives lucrative compensation in connection with his employment with the Company. Defendant Steinberg is not independent from Defendants Niehaus, Elzie, and Landman as they comprise the People, Culture and Compensation Committee ("Compensation Committee") and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Steinberg. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Steinberg could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

87.    Because of Defendant Steinberg's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Steinberg is unable to comply with his fiduciary duties and prosecute this action. Defendant Steinberg is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Sculley**

88.     Defendant Sculley is neither disinterested nor independent and is thus incapable of considering a demand to sue because he is the Company's co-founder, as recognized in the Company's 2024 Proxy Statement. As co-founder, Defendant Sculley is inherently conflicted and cannot reasonably consider a demand to sue the officers and directors who help run his Company and who are responsible for the future success of the Company. In addition, Defendant Sculley is not independent from Defendant Steinberg as they are each indebted to one another having built the Company together.

**Defendants Landman, Elzie, and Sculley**

89.     According to the Company's 2024 Proxy Statement:

On November 22, 2023, December 13, 2023 and March 7, 2024, the Company entered into stock repurchase agreements with William Landman and certain of his affiliates pursuant to which the Company repurchased an aggregate of 353,428 shares of our Class A Common Stock at the respective closing price on the date of each repurchase agreement, for an aggregate purchase price of approximately $3.25 million.

On March 7, 2024, the Company entered into a stock repurchase agreement with Jené Elzie pursuant to which the Company repurchased an aggregate of 14,662 shares of our Class A Common Stock at the closing price on the date of such repurchase agreement, for an aggregate purchase price of approximately $0.15 million.

On March 25, 2024, the Company entered into stock repurchase agreements with certain affiliates of John Sculley pursuant to which the Company repurchased an aggregate of 181,488 shares of our Class A Common Stock at the closing price on the date of such repurchase agreements, for an aggregate purchase price of approximately $2.0 million.

90.     As such, Defendants Landman, Elzie, and Sculley cannot be considered independent nor disinterested because they have each personally benefitted from the Company repurchasing their shares and are therefore conflicted and indebted to the Director Defendants that authorized these repurchases.

**Defendants Niehaus, Royan, Khan**

91.     During the Relevant Period, Defendants Niehaus, Royan, and Khan served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

92.     Defendants Niehaus, Royan, and Khan breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Niehaus, Royan, and Khan face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**<u>Additional Reasons Demand is Futile</u>**

93.     The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

94.     The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of

integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

95.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

96.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

97.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

98.     Publicly traded companies, such as Zeta, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages.  If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

99.     Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CLAIM

## (Against the Director Defendants for Violations of Section 14(a) of the Exchange Act)

100.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

102.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

103.    Under the direction and watch of the Director Defendants, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

104.    The 2024 Proxy Statement also failed to disclose that: (1) the Company was engaged in the Data Collection Misconduct; (2) as such, the Data Collection Misconduct almost completely spurred the Company's growth; (3) as a result of this, the Company's financial results were artificially inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

105.    In exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Steinberg and Sculley.

106.    The false and misleading elements of the 2024 Proxy Statement led to, among other

things, the re-election of Defendants Steinberg and Sculley to the Board, which allowed them to continue to breach their fiduciary duties to the Company.

107.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

## SECOND CLAIM

### (Against the Individual Defendants for Breach of Fiduciary Duties)

108.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

110.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

111.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials and by engaging in the Data Collection Misconduct. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

112.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

113.    As a direct and proximate result of the Individual Defendants' breach of their

fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## THIRD CLAIM

### (Against the Individual Defendants for Gross Mismanagement)

114.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

115.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

116.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

117.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## FOURTH CLAIM

### (Against the Individual Defendants for Waste of Corporate Assets)

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted

in continuous, connected, and ongoing harm to the Company.

120.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

121.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FIFTH CLAIM

## (Against the Individual Defendants for Unjust Enrichment)

122.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.   By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

124.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

125.   Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## SIXTH CLAIM

### (Against the Individual Defendants for Aiding and Abetting)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

128.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

129.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

130.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

131.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

132.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting;

C.    Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of Section 14(a) of the Exchange Act;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 23, 2024

**GAINEY McKENNA & EGLESTON**

*/s/Thomas J. McKenna*
Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

***Attorneys for Plaintiff***